**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Liliya F. Armstrong, | ) No. CV-09-01063-PHX-JAT |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Michael J. Astrue, Commissioner of Social Security, | ) |
| Defendant. | ) |

Plaintiff Liliya F. Armstrong filed this action under 42 U.S.C. § 405(g) seeking judicial review of Defendant Michael J. Astrue's denial of her request for Disabled Widow's Benefits ("DWB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 404-433, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. After considering the record before the Court and the parties' briefing of the issues, the Court affirms the Defendant's denial of Armstrong's request for benefits.

**I. Background**

**A. Procedural Background**

Ms. Armstrong's claims were denied on May 16, 2003. (Tr. 68-71 and 785-788). On June 12, 2006, Armstrong requested reconsideration. (Tr. 65). This was denied on January 17, 2007. (Tr. 62-64 and 781-783). Armstrong requested an administrative hearing on January 26, 2007. (Tr. 60).

A hearing was held on September 17, 2007 before Administrative Law Judge ("ALJ") Joan Knight. (Tr. 829-858). Armstrong appeared and testified through a Russian translator with prior counsel. She amended her onset date to December 31, 2005 to reflect her actual last day of work. (Tr. 832). A supplemental hearing was held on February 13, 2008 to take additional testimony. (Tr. 859-876).

A decision was issued on April 25, 2008. ALJ Knight found that Armstrong did not have medically severe impairments, and therefore, was not disabled. (Tr. 18-34). On May 9, 2008, Armstrong requested review of the ALJ's decision by the Appeals Council. (Tr. 15). After requesting review, Armstrong obtained counsel. (Tr. 11). The Appeals Council denied the request for review. (Tr. 4-7). This denial made the ALJ's decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g). *See* C.F.R. §§ 404.981, 416.1481.

**B. Medical Background**

In June of 2004, Dean A. Earp, M.D. noted that Armstrong had "moderate anxiety," although she was in no acute distress. (Tr. 459-60). At the request of Armstrong's daughter, Ms. Shaw, Dr. Earp referred Armstrong to David S. Dougherty, M.D. (Tr. 451-52). Armstrong told Dr. Dougherty that she experienced headaches, decreased hearing in her left ear, and reported "some spinning vertigo sensations" during her worst headaches. (*Id.*). She said that she took medication "to treat the blood pressure inside her brain." (*Id.*). Upon examination, Armstrong was in no distress apart from being "somewhat depressed in her affect." (*Id.*).

In August 2004, Armstrong presented to Bill Dafnis, D.O., for treatment of a headache and sinus pressure. (Tr. 456-58). Armstrong complained of some photophobia, nausea and headaches. (*Id.*). Dr. Dafnis concluded that Armstrong was in "mild distress," but was alert and orientated. (*Id.*). Because Armstrong had not undergone brain imaging since arriving in the United States, Dr. Dafnis sent Armstrong to the emergency room. (*Id.*). The CT scan performed in the emergency room was negative. (Tr. 462-63). Armstrong subsequently reported that her headaches had actually improved. (*Id.*). Armstrong also indicated that she

did not need the narcotic pain reliever, Lortab, that was provided to her at the emergency room. (Tr. 456).

Between December 2005 and May 2006, Armstrong received treatment from Lawrence Kramer, M.D. In December 2005, Armstrong complained of "not feeling well." (Tr. 396). Dr. Kramer noted a slightly enlarged thyroid, but that no lymph nodes were present. (Tr. 396, 399-400). In January 2006, Armstrong saw Dr. Kramer for bone density examinations. (Tr. 401-03). Armstrong again visited Dr. Kramer in January 2006 for general women's health examinations. (Tr. 404-08).

In February 2006, Armstrong was referred to Saif U. Jaffrey, M.D., for a psychiatric examination by the Department of Economic Security. (Tr. 443-445). Ms. Shaw told Dr. Jaffrey that Armstrong was diagnosed with a brain scar on her cerebellum in Russia during the early 1980s, and that, as a result of the scar, Armstrong experienced periods of seizures, which could be triggered by sudden head motions, bending, or odors, and which were accompanied by vomiting, dizziness, loss of consciousness and shaking. (Tr. 443). Ms. Shaw reported that Armstrong experienced difficulty balancing and hearing as a result of the scar. (*Id.*). She also told Dr. Jaffrey that Armstrong could not drive, cook or do laundry, and had never been able to work.[1] (*Id.*). Although Dr. Jaffrey opined that Armstrong's reported depression and cognitive problems would prevent her from working, Armstrong was alert, responsive and oriented to the month, date, year, and current president of Russia. (Tr. 444-45).

In June 2006, Armstrong presented to Zhanna Shpitalnik, M.D., a private psychiatrist who is reportedly fluent in Russian. (Tr. 506-10; *see generally* Tr. 265). Armstrong told Dr. Shpitalnik that she experienced anxiety, panic attacks, depression, difficulty sleeping, irritability, anger and physical aggression toward her daughter. (Tr. 506). Even though Armstrong considered suicide by overdose in May 2006, Armstrong denied any active

---

[1] Armstrong worked as an assistant housekeeper at the Franciscan Renewal Center in Scottsdale, Arizona from March 1, 2005, until March 31, 2006. (Tr. 146, 594, 836).

suicidal plans or intent. In fact, Armstrong expressed a fear of death. (*Id.*). Dr. Shpitalnik observed that Armstrong's mood swings and anger outbursts were "most connected to her unfortunate circumstances: unemployment, financial hardship, worsening physical and mental conditions." (*Id.*). Armstrong's appearance was good, and she was alert and oriented with good eye contact, logical associations, unremarkable stream of thought, intact memory, and normal perception (no hallucinations). (*Id.*). Nevertheless, Dr. Shpitalnik diagnosed Armstrong with panic disorder with agoraphobia, recurrent major depressive disorder, and ruled out bipolar disorder type II after the first visit with Armstrong. (Tr. 510). She prescribed medication Elavil, encouraged Armstrong to follow up with a neurologist and to apply for Value Options (an independent behavior health care company). (*Id.*).

On June 19, 2006, Dr. Shpitalnik reported that Armstrong was diagnosed with major depressive disorder, recurrent, severe, and panic disorder with agoraphobia. (Tr. 504). The doctor recommended that Armstrong have treatment with psychotropic medications and cognitive-behavioral therapy. (*Id.*). On June 21, 2006, Armstrong reported no change in complaints. (Tr. 511). Dr. Shpitalnik's exam noted dysphoric mood and an anxious and labile affect. (*Id.*). Dr. Shpitalnik continued Armstrong's medications and scheduled an appointment with Armstrong for two weeks later. (Tr. 512).

Armstrong subsequently presented to Value Options for initial intake on June 27, 2006. (Tr. 183). She was appropriately dressed and groomed. Even though Armstrong did note that she had no current goal of going back to school or going back to work due to medical problems such as fainting and seizures (Tr. 189), she stated that she was able to tend to her own independent living skills (bathing, eating, dressing, household management, and chores). (*Id.*). Armstrong said that although she lived with her daughter, she actually wanted to live independently in her own apartment. (*Id.*). Armstrong also expressed interest in having a "seizure alert service animal." (*Id.*).

Approximately a month later on July 24, 2006, Armstrong returned to Value Options. (Tr. 190). Armstrong reported dizziness and headaches on a daily basis and two seizures per week. (Tr. 214). Armstrong also reported hitting her daughter during angry outbursts. (Tr.

216). It was noted that Armstrong was tearful throughout the appointment. (*Id.*). A mental status evaluation revealed tearfulness, depressed mood, tearful affect, low self-esteem, depressive thought content, short-term memory loss, limited judgment and impulse control, and poor insight. (Tr. 225-26). However, the evaluation did note person/family strengths that Armstrong has that she can use to help her achieve her goals of living independently.[2] (Tr. 190-91). Armstrong was diagnosed with major depressive disorder, recurrent and post-traumatic stress disorder ("PTSD"). (Tr. 227).

Also in late June 2006, Armstrong presented to Bronislava Shafran, M.D., for evaluation. Armstrong reported episodic vertigo and nausea since 1981, stating that the symptoms initially occurred only with changes in position, but later became spontaneous and unprovoked. (Tr. 573-74, 603-04). The symptoms were "somewhat improved" with medication but Armstrong indicated that she never took the medication on a regular basis. (*Id.*). Armstrong reported poor memory over the last year; recent "spells of falls with 'darkened vision' lasting several seconds, usually associated with fatigue after [an] event"; severe fatigue; depression; panic attacks; "deja vu"; "jamais vu"; and lost time. (*Id.*). After reviewing Armstrong's psychiatric records, Dr. Shafran concluded that Armstrong had never been suicidal and never had a psychotic breakdown. (*Id.*).

Upon examination, Armstrong was alert and orientated with normal speech, language and mental status. (*Id.*). Armstrong correctly obtained 27 out of 30 possible points during a mini mental status exam ("MMSE") which is used to screen for cognitive impairments such as dementia. (*Id.*). Even though Dr. Shafran's impression included peripheral vertigo, Ménière's disease, peripheral neuropathy, and early dementia, she noted that some of Armstrong's symptoms may represent partial complex seizures or be migraine-related.

---

[2] The strengths listed were: cooperative, supportive family, loves to read, organized, good ILS skills, loves animals, cooperative, sincere, generous, warm hearted, sensitive to the needs of others, regularly attends appointments, takes her medication as prescribed and honest. (Tr. 190-91).

Dr. Shafran also observed the possibility of "secondary gain."[3] (Tr. 574). For example, Dr. Shafran requested an MRI of Armstrong's brain; however, Armstrong did not cooperate, cancelling the first MRI appointment that was scheduled, and refusing to attend the second. (*Id.*). Dr. Shafran also requested an EEG; a test was scheduled for July 2006, but there is no evidence that Armstrong attended. (*See generally* Tr. 573-574). Dr. Shafran recommended medications; however, Armstrong was "reluctant to consider" them, on the grounds that "even the top professors in Moscow" could not cure her disease. (Tr. 574). Dr. Shafran informed Armstrong that she had "a rather common condition, which can be treated." (*Id.*). Dr. Shafran requested that Armstrong return for a follow-up appointment the following month in July 2006; however, there is no evidence that Armstrong returned to Dr. Shafran until March 2007. (*See generally* Tr. 573-574). Finally, at several points during the examination, Armstrong asked whether her condition made her eligible for disability benefits. (Tr. 574).

During a subsequent psychiatric evaluation at Value Options on July 26, 2006 by Sue Sisley, M.D., Armstrong reported depression and anxiety, endorsed symptoms of PTSD, mild paranoia, and obsessive compulsive disorder, and said that she had been hearing voices since 1985. (Tr. 203, 208). Armstrong said that she had never done much work outside the home because she began having seizures at the age of thirty. (Tr. 207-08). Armstrong again reiterated that she was not interested in classes or work. (*Id.*). Dr. Sisley noted that Armstrong was casually dressed and fully orientated to time, person, place, and situation, with fair concentration and goal-directed thought processes. (*Id.*). She diagnosed Armstrong with a record of major depression (recurring, severe) and a record of PTSD. (Tr. 209). Dr. Sisley prescribed Elavil and Xanax and recommended counseling. (*Id.*).

On August 22, 2006, Armstrong returned to Value Options for another follow-up evaluation. (Tr. 265). Ms. Armstrong reported auditory and visual hallucinations of people

---

[3]"Secondary gain" is defined as "a benefit (as sympathetic attention) associated with mental illness." http://www.merriam-webster.com/medical/secondary%20gain. Date last visited June 28, 2010.

who "look like aliens" and "female voices calling [her] name," paranoia that others can read her mind, and messages from the TV and radio. (*Id.*). She also reported easy agitation, and severe anger outbursts, including trying to assault her daughter. (*Id.*).

In mid-October 2006, Armstrong presented to John C. Lincoln Deer Valley Hospital ("Lincoln Hospital") with complaints of chest pain. (Tr. 315). Upon examination, she was alert and orientated, and in no acute distress. (Tr. 317). Robert Enguidanos, M.D., concluded that the pain was musculoskeletal in nature. (Tr. 315). Patient was only proscribed Lipitor for cholesterol. (Tr. 315).

On November 7, 2006, Armstrong presented to Marty A. Feldman, D.O., for treatment of leg and back pain. (Tr. 481-82). Examination revealed that Armstrong had full 5/5 strength, cranial nerves were grossly intact, and Dr. Feldman found no evidence of sensory or motor loss. (*Id.*). Notably, Armstrong specifically denied lightheadedness, dizziness, loss of consciousness, and fainting spells. (*Id.*).

On November 21, 2006, Armstrong had an appointment with Dr. Shpitalnik. (Tr. 259-60). Armstrong did not report seizures, but rather indicated that she had headaches, dizziness, back pain, joint and muscle pain and fatigue. (*Id.*). Armstrong denied hallucinations or thoughts regarding suicide or self-harm. (*Id.*). Dr. Shpitalnik subsequently completed a "check-the-box form" regarding Armstrong's ability to do work-related activities provided for by Armstrong from the Arizona Department of Economic Security. (Tr. 388-89). Dr. Shpitalnik did opine by checking the requisite box, that Armstrong had poor to no ability to make occupational adjustments (apart from a "fair" ability to relate to co-workers), make performance adjustments, or make personal-social adjustments (apart from a "fair" ability to maintain personal appearance). (*Id.*). Dr. Shpitalnik also noted that Armstrong's depression and anxiety resulted in very poor attention and concentration, caused psychomotor retardation, focus difficulties, personal hygiene issues, and a fear of public places. (*Id.*).

On November 27, 2006, Armstrong presented to the Lincoln Hospital Emergency Room and reported that she became weak, lightheaded, and pale while driving. Armstrong

claimed that she "almost fainted" while driving the vehicle. (Tr. 302, 306; *see generally* 294-312). Armstrong's daughter, Ms. Shaw, the passenger at the time of the incident, stated that she thought that Armstrong "might have briefly passed out." (Tr. 306). Ms. Shaw stated that she "did not notice any seizure activity or shortness of breath." (*Id.*). Conspicuously, Ms. Shaw actually denied past similar episodes. (*Id.*). A CT scan was performed on Armstrong. (Tr. 310). The scan resulted in normal limits, apart from a "tiny, high density area in the right." (*Id.*). An MRI of Armstrong's brain did not reveal evidence of acute intracranial hemorrhage (severe bleeding inside the skull), nor ischemia (restricted blood flow), or mass lesion, but did show "mild," non-specific periventricular signal alteration consistent with chronic microangiopathic gliosis. (Tr. 312).

On December 11, 2006, Armstrong visited Dr. Feldman. (Tr. 478-80). Armstrong told Dr. Feldman that she had been stopped at a light during the November 27, 2006 incident, and that she was able to pull the car into a station before losing consciousness. (Tr. 478). Ms. Shaw estimated that Armstrong was unconscious for three to five minutes. (*Id.*). Dr. Feldman indicated that Armstrong had full 5/5 strength, her cranial nerves were grossly intact, and there was no evidence of sensory or motor loss. (*Id.*). Dr. Feldman's assessment included "syncopy, etiology unknown." (*Id.*).

Armstrong visited Value Options for a follow-up Psychiatric Progress Evaluation on December 12, 2006. (Tr. 257). During the session, Armstrong stated that she was less depressed and anxious and sleeping better, but still had panic attacks on and off. (*Id.*). Dr. Shpitalnik continued Armstrong's medications and reported that her GAF was 50-55.[4] (Tr. 258).

During a January 2007 Value Options appointment, Armstrong reported that she was "satisfied" with living with her daughter for the time being, but that she would eventually like to live in her own apartment. (Tr. 251). Armstrong said that she was able to tend to her

---

[4]A GAF score of 51-60 denotes "[m]oderate symptoms (flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (few friends, conflicts with peers or co-workers)". DSM, p. 34.

own independent living skills and was only living with her daughter because she was financially dependent on her daughter. (*Id.*). She stated that she did not engage in social activities in large part because of her inability to speak English. (*Id.*). During this time period, Dr. Shpitalnik noted that Armstrong did not have depressive symptoms. (Tr. 249). Armstrong said that she was mostly anxious in public places and reported panic attacks "on and off." (*Id.*). Dr. Shpitalnik indicated that Armstrong had good hygiene, an appropriate appearance, and goal-directed thoughts. (*Id.*). Armstrong stated she was sleeping well and that she found Elavil helpful. (*Id.*). She denied suicidal thoughts and had intact memory, good insight and good judgment. (*Id.*). Dr. Shpitalnik rated her GAF as a 55 to 60 and adjusted her medication. (*Id.*).

Armstrong returned to Dr. Shafran on March 26, 2007 due to complaints of severe vertigo and depression. (Tr. 572). Dr. Shafran conducted an examination, which was essentially the same as Armstrong's June 2006 examination.(*Id.*). Armstrong reported testing at Lincoln Hospital five months earlier in November 2006, but said that the results were not available yet. (*Id.*). Ms. Shaw requested that Dr. Shafran produce a note stating that patient cannot work. (*Id.*; *see* Tr. 476). Ms. Shaw indicated that both she and her mother "are very upset that Liliya is not getting any financial support since she did not live in the States five years yet."(*Id.*). Dr. Shafran noted relief of her anxiety with injection of acupuncture points and opined, "she cannot work now because of peripheral vertigo and depression." (*Id.*). However, Dr. Shafran noted the possibility of secondary gain. (*Id.*).

Later that month on March 29, 2007, Armstrong returned to Value Options. Dr. Shpitalnik completed a "Mental Residual Functional Capacity Assessment" form in which she indicated that Armstrong had moderately severe to severe limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaption. (Tr. 473-75). Dr. Shpitalnik stated that she had diagnosed Armstrong with major depressive disorder (recurrent, severe), and panic disorder with agoraphobia, and opined that Armstrong's condition was "not improving much" despite treatment. (Tr. 475). Then, Dr. Shpitalnik opined that Armstrong's condition impaired her ability to take care of her daily

activities (showering, cooking, cleaning, managing finances, and shopping) and her ability to work. (*Id.*). Dr. Shpitalnik surmised that Armstrong had difficulty staying focused, and an impaired ability to respond to and handle daily stress, and was unable to learn new information. (*Id.*). Dr. Shpitalnik further opined that Armstrong was homebound due to a fear of public places. (*Id.*).

The next month at another Value Options consultation, Armstrong advised Dr. Shpitalnik that she was "not feeling well." (Tr. 547-49). Armstrong complained of nightmares, decreased sleep, decreased appetite, feeling paranoid, and hearing voices. (Tr. 548). A mental status examination revealed hypoactive motor findings, soft/slow speech, and a depressed mood. (*Id.*). However, Armstrong had good hygiene and an appropriate appearance, intact memory, good insight and judgment, and lacked suicidal thoughts. (Tr. 547-48). Armstrong was diagnosed with major depression and anxiety, and a GAF score of 50. (Tr. 547). In May 2007, Armstrong stated that she "fe[lt] a little bit better" and "started to sleep." (Tr. 536). She reported 30% improvement since last month. (*Id.*). Again, Armstrong's appearance was appropriate and displayed good hygiene. (*Id.*). Although Armstrong's mood was marked as "depressed" and "anxious," Armstrong's affect was appropriate and her attitude was cooperative. (*Id.*).

The next month, Armstrong reported insomnia and stated that she did not want to live, although she denied having a plan to commit suicide. (Tr. 529-30). Ms. Shaw reported that Armstrong "faint[ed] sometimes" and that she sometimes became aggressive. (*Id.*). Armstrong was appropriately dressed with good hygiene. (*Id.*). She reported hearing music, but denied delusions and had fair insight and judgment. (*Id.*). Armstrong's GAF was rated as a 45. (*Id.*).

Armstrong presented to Dr. Shafran on July 16, 2007, reporting depression and "frequent" falls without warning. (Tr. 616). Dr. Shafran reported that Ms. Armstrong was treated for seizure disorder and Ménière's disease. (*Id.*). Dr. Shafran provided a note that Armstrong was "quite disabled and is unable to afford the medications, tests or treatments." (*Id.*).

Also in July, Armstrong visited Dr. Shpitalnik at Value Options. (Tr. 502-03). Armstrong reported anxiety, depression, irritability, recurrent panic attacks, decreased energy, and difficulty sleeping. (*Id.*). Nevertheless, Armstrong's appearance was good; she was alert and oriented, with no hallucinations, suicidal thoughts, memory impairments, or confusion. (*Id.*).

During an August 2007 appointment with Dr. Shpitalnik, Armstrong was tearful and expressed "vague" suicidal thoughts (but did not have a plan or intent). (Tr. 524). Her appearance was disheveled, but her thoughts were goal-directed, she did not have hallucinations or delusion, her memory was grossly intact and she had good judgment and insight. (*Id.*). Armstrong was diagnosed with major depressive disorder, recurrent, severe, panic disorder and a GAF score of 35. (*Id.*). It was recommended that she start Prozac and Depakote, and follow-up with her primary care physician for her medical needs. (*Id.*). Later that month, Armstrong visited Value Options again. (Tr. 587). Armstrong reported little change in her symptoms. (*Id.*). Dr. Shpitalnik's mental status examination revealed an irritable, dysphoric, and depressed mood, an anxious and labile affect, and psychosocial stressors. (*Id.*). Dr. Shpitalnik increased her dose of Seoquel and Elavil. (Tr. 588).

In September 2007, Dr. Shafran completed a Ménière's questionnaire and a seizures questionnaire on Armstrong. (Tr. 578-87). Dr. Shafran stated that Armstrong had Ménière's disease and that she experienced frequent attacks of balance disturbance, tinnitus, progressive hearing loss [5], vertigo, nausea, and fatigue. (Tr. 578). Based on Armstrong's complaints, Dr. Shafran said that Armstrong had one to three Ménière's episodes per month, each of which typically lasted several hours.[6] (Tr. 579). Dr. Shafan stated that Armstrong's prognosis was guarded, and that she was incapable of even low stress jobs. (Tr. 578-81). Also based on

[5]The progressive hearing loss indicated by Dr. Shafran was not established by audiometry. Dr. Shafran noted that this was due to the inability of Armstrong to afford the tests. (Tr. 578-79).

[6]Dr. Shafran did not witness Armstrong's Ménière's episodes. (*See generally* Tr. 578-81).

Armstrong's stated symptoms, Dr. Shafran said that Armstrong experienced up to three seizures per month, that each seizure lasted several minutes[7], and that she experienced confusion, exhaustion and severe headache after a seizure. (Tr. 581). Dr. Shafran opined that Armstrong would have to rest one to two days after a seizure before returning to work. (*Id.*). The doctor stated that Armstrong could take a bus alone, but should not work at heights, operate a motor vehicle, or work with power machines that require an alert operator. (Tr. 585).

In November 2007, Armstrong was referred to Elliot D. Salk, Ph.D., for a mental status evaluation by DES-DDSA. (Tr. 754-57). Dr. Salk reviewed the records provided for by DES-DDSA which indicated depression, anxiety, hypothyroidism, cerebellar dysfunction, arthritis, back pain, and syncope. (Tr. 754). Dr. Salk also noted that "[p]revious documents . . . indicate concerns about the claimant's credibility." (*Id.*). Armstrong told Dr. Salk that she had a problem in the back of her brain and scars on the back of her head, but specifically denied being disabled. (*Id.*). When asked if she was able to work, she reported falling down. (*Id.*). Armstrong stated that she was not currently taking any medications. (Tr. 755). However, Armstrong did twice ask for medication. (*Id.*). Armstrong also indicated that her daughter brought her medicine "for her health" which she took. (*Id.*). Armstrong stated that she was not currently seeing a psychiatrist or counselor. (*Id.*). She denied depression, but cried during Dr. Salk's examination. (*Id.*). Armstrong also reported that she was not sleeping, and that she feared dying in her sleep. (*Id.*). Armstrong denied shopping, but said that she sometimes went to stores (such as supermarkets) with her daughter. (Tr. 756). She stated that she did not cook, clean or do laundry, and denied getting together with family or friends. (*Id.*). Armstrong said that she read occasionally, but tired easily. (*Id.*). During the examination when Dr. Salk asked Armstrong the "found envelope question," Armstrong reported that she does not need the envelope and it does not belong to her. (Tr. 757). She added that "it could be a bomb." (*Id.*). Dr. Salk diagnosed Armstrong with major depressive

---

[7]Dr. Shafran did not witness Armstrong's seizures. (*See generally* Tr. 578-81).

disorder (severe, without psychotic features) and cognitive disorder NOS. (*Id.*).

Around two months later in January 2008, Armstrong presented to Lincoln Hospital and reported that she was experiencing pain and had fainted the previous day. (Tr. 765-68; *see generally* 765-778). X-ray tests indicated that "no acute abnormality is identified in the chest." (Tr. 770). Head CT scan revealed "small basal ganglia calcification on the right," but there is was "no evidence of acute infarction hemorrhage or mass." (Tr. 771).

On February 18, 2008, Armstrong visited Dr. Shafran reporting another seizure-like episode with loss of consciousness and hospitalization. (Tr. 780). Armstrong indicated that she could not afford her medication. (*Id.*). Ms. Shaw told Dr. Shafran that Armstrong had been "found to be unimpaired due to [Dr. Shafran's] notes" to which Dr. Shafran commented that he "could not believe his ears because she is as impaired physically and mentally *as could be.*" (*Id.*)(emphasis added). Dr. Shafran again diagnosed Armstrong with partial complex seizures, peripheral vertigo, depression, history of Ménière's disease, peripheral neuropathy, and dementia, and said that Armstrong's condition had "deteriorated significantly" over the last six months. (*Id.*).

**II. Standard of Review**

The Court will not set aside the Commissioner's decision unless: (1) the findings of fact are not supported by substantial evidence in the record, or (2) the decision is based on a legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If supported by substantial evidence, the Commissioner's final decision is conclusive upon judicial review. 42 U.S.C. § 405(g); *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

"Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe*, 108 F.3d at 980. "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). In determining whether substantial evidence supports the Commissioner's decision, the Court must review evidence both supporting and detracting the decision. *Smolen v.*

- 13 -

*Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

If the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, then the Court will uphold the decision. *Id.* at 1040. The Court may not substitute its judgment for that of the Commissioner. *See Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). It is the ALJ's role is to make credibility determinations and to resolve conflicts in medical testimony. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). However, if the ALJ applied improper legal standards, the Court must set aside a decision even if it is supported by substantial evidence. *See Ceguerra v. Sec'y of Health & Human Servs.*, 993 F.2d 735, 739 (9th Cir. 1991).

### III. Analysis

To qualify for disability benefits under the Act, a claimant must show, among other things, that she is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423(d)(2)(A).

### A. The Sequential Process

The Social Security Regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520; *see also Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

First, the ALJ determines whether the claimant is "doing substantial gainful activity."

20 C.F.R. § 404.1520(a)(4)(I).  If so, the claimant is not disabled.

Second, if the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." *Id.* at § 404.1520(a)(4)(ii).  To be considered severe, the impairment must "significantly limit [the claimant's] physical or mental ability to do basic work activities." *Id.* at § 404.1520(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* at §§ 404.1521(b), 416.921(b).  Further, the impairment must either be expected "to result in death" or "to last for a continuous period of twelve months." *Id.* at § 404.1509 (incorporated by reference in *id.* at § 404.1520(a)(4)(ii)).  If the claimant does not have a severe impairment, the claimant is not disabled. *Id.* at § 404.1520(a)(4)(ii). This is because if the impairments are not severe enough to limit significantly the claimant's ability to perform most jobs, by definition the impairment does not prevent the claimant from engaging in any substantial gainful activity. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

Having found a severe impairment, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry.  If not, before proceeding to the fourth step, the ALJ will make a finding regarding the claimant's "residual functional capacity based on all relevant medical and other evidence in [the] record." *Id.* § 404.1520(e). A claimant's "residual functional capacity" is the most she can do despite all her impairments, including those that are not severe, and any related symptoms. *Id.* § 404.1545(a)(1).

Fourth, the ALJ determines, despite the impairments, whether the claimant can still perform "past relevant work." *Id.* § 404.1520(a)(4)(iv).  To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* § 404.1520(f).  If the claimant can still perform the kind of work she previously engaged in, the claimant is not disabled.  Otherwise, the ALJ proceeds to the final step.

At the final step, the ALJ determines whether the claimant "can make an adjustment

to other work" that exists in the national economy. *Id.* § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's "residual functional capacity" and her "age, education, and work experience." *Id.* § 404.1520(g)(1). If the claimant can perform other work, she is not disabled. The Commissioner has the burden of proving the claimant can perform other work. *Reddick*, 157 F.3d at 721. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*, 278 F.3d 947, 955 (2002) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999)). "If the Commissioner meets his burden, the claimant has failed to establish disability." *Thomas*, 278 F.3d at 955.

**B. The ALJ's Findings**

In this case, the ALJ determined that Armstrong had medically determinable impairments.[8] (Tr. 26). However, the ALJ concluded that Armstrong's impairments were not severe because they did not significantly limit (and were not expected to significantly limit) her ability to perform basic work activities for twelve consecutive months. (Tr. 24, Findings 4 and 5); *see* 20 C.F.R. § 404.1509; 404.152(a)(4)(ii), 404.1521.

**C. Alleged Step Two Error**

At step two of the sequential evaluation process, a claimant must show (1) that she has a medically determinable impairment, and (2) that her impairment(s) or their symptoms affect her ability to perform basic work activities in order to qualify as a "severe impairment." *See Edlund v. Massanari*, 253 F.3d 1152, 1159-60 (9th Cir. 2001) (citing Social Security Ruling ("SSR") 96-3p[9], 1996 WL 374181; SSR 96-7p, 1996 WL 374186). The Social Security Regulations define "basic work activities" to include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, the ability to understand, carry out and remember simple instructions; to use judgment; to respond

---

[8]Medically determinable impairments included: episodic vertigo by history, anxiety and a mood disorder.

[9]While SSRs do not carry "the force of law," they are binding on ALJs. *See Bray v. Commissioner of Social Security*, 554 F.3d 1219 (9th Cir. 2009).

appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(3); 20 C.F.R. § 416.921(b)(3). If an ALJ is able to clearly determine the effect of an impairment on the individual's ability to do basic work activities, the sequential evaluation ends with the "not severe step." SSR 85-28 (1985); *see Webb v. Barnhart*, 433 F.3d 683, 687 (2005). An ALJ may find that a claimant lacks a medically severe impairment only when his conclusion is "clearly established by medical evidence." *Id.*

Applying the normal standard of review to the requirements of step two, the Court must determine whether the ALJ had substantial evidence to find that Armstrong's disability was not severe. *Webb*, 433 F.3d at 687. The ALJ's reasons must be meet the "clear and convincing" standard in order to pass muster. *Id.* However, if there is affirmative evidence showing that the claimant is malingering, then the ALJ's reasons do not need to meet the "clear and convincing" test. *Id.*

Armstrong argues that step two of the five-step analysis must only be applied to *de minimus* claims and that therefore the ALJ erred at step two by denying Armstrong's nongroundless claim. *See Bowen*, 482 U.S. at 158; *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). First, Armstrong argues that the ALJ did not give clear and convincing reasons for denying Armstrong's subjective pain testimony. Second, Armstrong argues that the ALJ did not properly evaluate the medical opinions of record. For the reasons identified below, this Court finds that the ALJ did not err at step two; rather, the ALJ properly evaluated evidence regarding the credibility of Armstrong's subjective statements, as well as the medical evidence and medical source opinions.

### 1. Subjective Complaint Testimony

Armstrong first argues that the ALJ erred at step two of the sequential five-step process because the ALJ failed to properly evaluate Armstrong's credibility. This Court concludes that the ALJ had a basis for finding malingering. Therefore, there is substantial evidence to affirm the ALJ's finding regarding the credibility of the Armstrong's statements.

The determination of whether to accept a claimant's subjective symptom testimony

requires a two-step analysis. 20 C.F.R. § 404.1529; *Smolen v. Chater*, 80 F.3d 1273, 1281; SSR 96-7p at *2-3. First, the ALJ must determine whether there is a medically determinable impairment that reasonably could be expected to cause a claimant's symptoms. *Id*. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect an individual's ability to do basic work activities. SSR 96-7p at *2. This second step requires the ALJ to evaluate the credibility of an individual's statements about the symptom(s) and its functional effects. *Id.*

The ALJ must carefully consider an individual's statements about their symptoms with the rest of the relevant evidence in the case record in order to reach a conclusion about the credibility of an individual's statements. *Id.* at *2-3. The ALJ cannot discredit a claimant's testimony as to the severity of symptoms solely because they are unsupported by objective medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991). Rather, the ALJ must provide "clear and convincing" reasons for rejecting a claimant's testimony. *Smolen*, 80 F.3d at 1284; *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988).

However, if there is affirmative evidence of malingering, the ALJ may discredit a claimant's subjective testimony. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 n.1 (9th Cir. 2008) (recognizing that an ALJ need not make a specific finding of malingering); *see also Hardisty v. Astrue*, 592 F.3d 1072, 1075 (9th Cir. 2010) (concluding that there was "some basis" for the ALJ's finding of malingering).

Here, the ALJ found that Armstrong met the first prong of the two-part test to credit subjective testimony. The ALJ concluded that Armstrong's medically determinable impairments "could reasonably be expected to produce only *some* of the alleged symptoms." (Tr. 26) (emphasis added). However, the ALJ determined that Armstrong did not meet the second prong. Armstrong's statements concerning the intensity, persistence and limiting effects of her symptoms were "not credible to the extent they are inconsistent with finding that the claimant has no severe impairment." (Tr. 26). In support of this finding, the ALJ

noted that a cooperative disability investigation's unit investigated Armstrong because of a suspicion that Armstrong was malingering.

In affirming the ALJ's decision, this Court notes that there is substantial evidence of malingering. The ALJ exceeded her burden by identifying clear and convincing reasons for concluding that Armstrong was malingering.[10]

For example, Armstrong and Ms. Shaw stated that Armstrong was unable to clean, cook, or drive; however, the evidence showed that she could and did perform these activities despite her alleged limitations. (Tr. 31-33; *compare* Tr. 136-37, 161-62, 444, 756 *with* 140, 145-46, 190, 231, 251). In addition, Armstrong and Ms. Shaw asserted that Armstrong's ability to walk was severely limited which was the reason for Armstrong's use of a walker; however, agency employees witnessed Armstrong climb a flight of stairs twice without physical discomfort during an hour long meeting in Armstrong's home. (*compare* Tr. 112, 120, 495-96, 853 *with* Tr. 146).

The Office of Inspector General ("OIG") report indicated that despite Armstrong's alleged history of seizures, she had an unrestricted driver's license and drove. (*Id.*). In fact, when questioned about her driving, Armstrong indicated that "she was always by [herself] in the car" and "[her] daughter never let [her] take the car." (Tr. 849). However, records from John C. Lincoln Hospital indicate that Armstrong drove with her daughter in the car. (Tr. 850).

The ALJ's credibility determination is further supported by evidence that Armstrong and Ms. Shaw provided inaccurate information to treating and examining medical sources. For instance, Armstrong and Ms. Shaw told Dr. Jaffrey that Armstrong had never driven or worked, which was untrue. (Tr. 26, 31, 33 (citing Tr. 443-444)). Also, Armstrong also told Dr. Sisley that she had never worked much outside the home due to her seizures. (Tr. 33,

---

[10]As noted previously, the ALJ only need to have "some basis" of malingering. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d at 1160 n.1. After this basis, the ALJ need not give clear and convincing reasons for discrediting a claimant's subjective testimony. *See Smolen*, 80 F.3d at 1284.

206); *cf. Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (finding that the ALJ's decision to discredit the claimant's statements was supported by the claimant's tendency to exaggerate).

The ALJ also noted that, although Armstrong had allegedly experienced seizures since 1980s, she did not seek treatment for seizures until mid-2006 (Tr. 26, 27, 34; *see* 451-52, 456-60, 467). In fact, although Armstrong had medical insurance while working at Franciscan Renewal Center and she experienced "too many seizures to count" during December 2005, the record does not show that she reported seizures to her treating physician during this time period. (Tr. 132, 393-96, 399-400, 407-10, 840); s*ee Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (finding a claimant's failure to report symptoms was a clear and convincing reason for rejecting his statements).

The record further shows that, even after Armstrong reported the alleged seizures, she failed to appear for a scheduled MRI[11] on two occasions (Tr. 27; *see* Tr. 574); *cf. Tonapetyan v. Halter*, 242 F.3d at 1148 (finding that the claimant's lack of cooperation during consultative examinations supported the ALJ's credibility finding).

Mental health records suggest significant impairments, but the mental status examinations showed the Armstrong's cognitive functioning was in the normal range without evidence of an impairment. The medical expert testified during the hearing that he could not explain the discrepancy between the mental status examinations and the mental health records. (Tr. 26, 29 (citing Tr. 573-76, 869-70)); *see Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (finding that "although a lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in [her] credibility analysis.").

Armstrong also testified that she had a problem with incontinence. (Tr. 846-847). Ms. Shaw testified to this fact as well. However, this has never been reported to treating medical

---

[11]When an MRI was eventually performed in November 2006, the results were not significant. (Tr. 28, 312).

professionals. (*See* Tr. 33). The ALJ remarked that this inconsistency raises the question whether Armstrong has exaggerated her symptoms to obtain disability benefits. (Tr. 33).

Last, it is clear that Armstrong's actions exemplify characteristics of secondary gain. Armstrong even asked Dr. Shafran about whether her purported symptoms made her eligible for disability benefits. (Tr. 574). Furthermore, Ms. Shaw requested that Dr. Shafran produce a note stating that patient cannot work. (Tr. 572; *see* Tr. 476). After witnessing these two incidents, Dr. Shafran, a treating physician, noted the possibility of Armstrong's secondary gain himself. (*Id.*).

These inconsistences are not minor. They reflect Armstrong's efforts to malinger. As such, they provide clear and convincing reasons for discounting statements made by Armstrong and Ms. Shaw.[12]

The Court finds that the ALJ had clear and convincing reasons for concluding that Armstrong was malingering, above the requisite "some basis" standard. The ALJ did not err because discrediting Armstrong's subjective testimony has a substantial basis.

## 2. Medical Evidence and Medical Source Opinions

Next, Armstrong argues that the ALJ failed to properly evaluate the opinions of Drs. Shafran, Shpitalnik, Jaffrey, and Salk in concluding that Armstrong had no severe mental and physical impairments. (Pl. Br. at 21-26). Armstrong argues that, as such, the ALJ's findings are not supported by substantial evidence (*Id.*).

Once the requisite relationship between the medically determinable impairment(s) and the alleged symptom(s) is established, the intensity, persistence, and limiting effects of the symptom(s) must be considered along with the objective medical and other evidence in determining whether the impairment or combination of impairments is severe. SSR 96-3p,

---

[12]In assessing statements from lay witnesses such as Ms. Shaw, the ALJ need only give reasons that are germane to the witness. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). Where the ALJ provided clear and convincing reasons for rejecting the claimant's subjective complaints, and a lay witness's statements were similar to the claimant's complaints, the ALJ has also given germane reasons for rejecting the lay witness's testimony. *See id.*

1996 WL 374181, *2. Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. *Id.*

Evidence about the *effects* of an individual's impairment(s) must be evaluated based on the credibility of an individual's statements. *Id.* (emphasis added). This allows the ALJ to assess the effect of the impairment(s) on an individual's ability to do basic work activities. *Id.* Once the ALJ determines the extent to which an individual's symptoms limit the ability to do basic work activities, the *impact* of the symptoms on an individual's ability to function and objective medical and other evidence must be considered in order to determine whether an individual's impairment(s) is 'severe' at step 2 of the sequential evaluation process . . ." SSR 96-7p at *3 (emphasis added).

Because a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must be considered at step two.[13] SSR 96-3p at *2. If the ALJ finds that such symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the ALJ must find that the impairment(s) is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment(s) is severe. *Id.*

Here, the ALJ concluded that there was a medically determinable mental impairment.[14] (Tr. 27). However, because Armstrong had very little treatment for her

---

[13]This step is provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms. SSR 96-3p at *2.

[14] While the ALJ did conclude that Armstrong had a mental impairment, the ALJ did not conclude that Armstrong had a physical impairment. Although Armstrong alleged that she had a longstanding history of frequent and severe seizure, she had been treated on numerous occasions and failed to mention seizures to treating medical professionals. ( *See* Tr. 183, 189, 249-51, 259-60, 294-312, 315, 317, 396, 399-400, 401-08, 459-60, 451-52, 456-58, 481-82, 502-03, 506, 511, 524, 547-49, 572-74, 603-04, 754-757, 765-68). Also,

- 22 -

alleged impairments and there were significant inconsistences in the record, the ALJ opined that Armstrong did not have a severe impairment. Armstrong argues first that the ALJ erred by not assigning significant weight to the consultative examiners. Second, Armstrong argues that there is also no substantial evidence to support the ALJ's decision to not give controlling weight to the treating psychiatrist.

### a. Consultative Examiners

First, Armstrong alleges that the ALJ erred because the ALJ did not attribute significant weight to the opinions from Drs. Jaffery and Salk. The ALJ stated that she did assign weight to these opinions because (1) they did not review the "entire record," (2) their opinions were based on one-time examinations, and (3) were "unrealistic" when objective evidence was considered. (Tr. 31). Although Armstrong claims that "Dr. Salk specifically indicated that he was provided with Ms. Armstrong's medical records" (Pl. Br. 21), the record indicates that he was only given Armstrong's records provided for by DES-DDSA, not the entire record provided to the ALJ. (Tr. 754).

Also, Drs. Jaffrey and Salk did not treat Armstrong; rather, each saw Armstrong only one time, for a consultative examination. *See* 20 C.F.R. § 404.1527(d)(2) (noting that, in assessing medical opinions, the ALJ should consider whether the medical source had a treatment relationship with the claimant).

Further, as the ALJ observed, the objective physical information that Armstrong and Ms. Shaw provided to medical sources was inconsistent with the evidence of record. (Tr. 26, 31, 33). For example, Armstrong and Ms. Shaw told Dr. Jaffrey that Armstrong had never driven or worked, which was untrue. (Tr. 26, 33 (citing Tr. 443-44)). Similarly, while Armstrong walked slowly during her examination with Dr. Salk (Tr. 757), the OIG investigators observed her quickly walk up and down stairs, without any physical discomfort. (Tr. 146).

---

Armstrong actually denied dizziness, lightheadedness, loss of consciousness or fainting spells to a physician on November 7, 2006. (Tr. 481-82). As a result, the ALJ concluded that the treatment records do not support the frequency and severity of symptoms alleged. (Tr. 28).

As a result, there is substantial evidence that the ALJ properly discounted Dr. Jaffery and Dr. Salk's opinions in light of evidence that Armstrong exaggerated her symptoms in order to obtain benefits.

### b. Treating Physician

Armstrong next argues that the ALJ erred because the ALJ did not give Armstrong's treating psychiatrist, Dr. Shpitalnik, controlling weight.

"Where a treating physician's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons." *Thomas*, 278 F.3d at 956-57. However, the ALJ can reject the opinion of a treating physician in favor of the conflicting opinion of another examining *physician* "if the ALJ makes 'findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" Id. at 957 (quoting *Magallanes*, 881 F.2d at 751 (emphasis added)). Setting forth specific, legitimate reasons is accomplished by a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Magallanes*, 881 F.2d at 751))

Here, the ALJ did not give Dr. Shpitalnik controlling weight[15] because there were normal findings on mini-mental status examinations conducted by the treating neurologist, Dr. Shafran. (Tr. 32 (citing Tr. 869-70)). The ALJ concluded that Dr. Shpitalnik's opinion was contradicted by evidence that Armstrong's cognitive functioning was within normal limits. (*Id.*). Although Armstrong attempts to distinguish between a neurologist and a mental health practitioner of record, this Court's binding precedent does not distinguish in that manner. The case law precedent states "contradicted by another *doctor*" or "conflicting opinion of other examining *physician*." *Thomas*, 278 F.3d at 956-57 (emphasis added); *Reddick* , 157 F.3d at 725 (emphasis added). The ALJ can reject Dr. Shpitalnik's opinions

---

[15]The ALJ also discounted Dr. Shpitalnik's opinion because Dr. Shpitalnik relied on Armstrong's subjective complaints which the ALJ discounted. However, Armstrong does not discuss this in Plaintiff's Brief. As such, the Court will not examine this argument further.

in favor of the Dr. Shafran's mental status evaluation because there is a specific, legitimate reason. The ALJ set forth specific, legitimate reasons by providing a lengthy summary of facts (*See generally* Tr. 23-34) and conflicting clinical evidence (namely, the mental status evaluations). (Tr. 29). The ALJ stated her interpretation and made her own findings as well. (Tr. 27-30). Therefore, the ALJ's decision to not give Dr. Shpitalnik's findings controlling weight was not in error.

**IV. Conclusion**

For the reasons discussed above: the ALJ properly discredited Armstrong's testimony; the ALJ also properly resolved the conflicts in the medical evidence. As such, the Court will affirm the decision of the ALJ.

Accordingly,

**IT IS ORDERED** that the decision of the Administrative Law Judge and the Commissioner of Social Security be affirmed.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly. The judgment will serve as the mandate of this Court.

DATED this 12th day of July, 2010.

James A. Teilborg
United States District Judge

- 25 -